# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GREGORY ANDERSON,

        Petitioner,                             Case No. 05-CV-74596-DT

                                                    Honorable Arthur J. Tarnow

v.

MICHAEL W. CURLEY,

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S
## PETITION FOR WRIT OF HABEAS CORPUS

### I. Introduction

Petitioner Gregory Anderson, through counsel, has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. He is currently incarcerated at Camp Branch Correctional Facility in Coldwater, Michigan, pursuant to convictions for assault with intent to commit great bodily harm and felony firearm. For the reasons stated, the Court denies Petitioner's writ of habeas corpus.

### II. Facts

This case arises from the December 2, 1997, shooting of Denise Spivey ("Complainant"), who was outside her grandmother's house when she was shot in the buttocks. The complainant described her perpetrator to the police as being 5'8" to 5'10", two-hundred pounds, with a light complexion. Her aunt, Clara Spivey, the other main witness in the case, also testified, and gave the same description of the perpetrator to the police. The trial judge noted that Petitioner is dark-skinned. The pre-sentence report says that Petitioner is five-feet-five inches tall and one-hundred-seventy-five pounds.

According to the complainant's testimony, on December 2, 1997, she was in a car riding back from a wake with her aunt, Clara Spivey, and her cousin, Christina Williams, when they decided to stop at a cousin's home on Eastwood in Detroit, Michigan. When they arrived, Tamikia Spivey, another cousin of theirs but not the owner of the home on Eastwood, was sitting in a car parked in front of the house. The complainant testified that she saw Petitioner in the driver's seat of that car–described as a four-door reddish car.

The complainant said that Christina pulled up along side the parked car and she attempted to speak to Tamikia through the closed-car window, but Tamikia just waved her off. The complainant said that she then got out of the car and proceeded to walk toward the car, calling out to Tamikia. It is her testimony that Petitioner then rolled down the window and asked her if she had anything to say to him, to which she replied "I don't have shit to say to you." (Trial Tr. Vol. I. p.17.) The complainant said that she then got back into Christina's car and told them "that's Greg, the one who raped my friend," at which point defense counsel objected. The trial court however overruled the objection. (Trial Tr. Vol. I. p. 22.)

According to the complainant's testimony, Petitioner then got out of his car and tried to hit her, but she was already in Christina's car. She said that Petitioner then got back into his car and, as Christina started to drive off, Petitioner turned his car in an apparent effort to cut her off. The complainant testified that Christina then drove off and headed to her grandmother's house at 14482 Novara Street in Detroit, Michigan.

When they arrived at the grandmother's house, the complainant, Christina, and her aunt went into the house. Shortly afterward, the aunt, Clara Spivey, left the house and walked to a

nearby corner store to get something for her mother. On the way to the store, Clara met her friend, Kimberly Francis, who accompanied her to the store.

When the aunt returned from the store with Ms. Francis, she saw Petitioner in his car sitting outside the house. Clara entered the house and told the complainant that Greg (Petitioner) was outside and wanted her.

The complainant testified that she then went outside and stood on her grandmother's porch. She said that she saw a burgundy "Aspire" car with Petitioner inside the car and another person, who she believed to be Tamikia, but was not sure. An argument ensued between them. According to the complainant's testimony, she asked him what he was doing there and he replied, "Bitch, you got something to say to me? Bitch, next time I'm going to kill you." (Trial Tr. Vol. I. p. 33.) The complainant testified that she then saw fire coming from Petitioner's direction and then heard shots. She said that she tried to retreat into the house. When the first shot went off, the complainant testified that she heard Tamikia's voice saying, Greg, no." (Trial Tr. Vol. pp. 23, 31-37.)

The complainant was shot in the buttocks. She was pregnant at the time. The bullet continued into her uterus where it caused a miscarriage.

Clara Spivey, the complainant's aunt, testified that, after attending a wake with the complainant and Christina Williams, they drove to Tamikia's house, where she saw Petitioner and Tamikia sitting in a car outside the house. Ms. Spivey testified that the complainant got out of the car and tried to talk to Tamikia, but Tamikia did not respond. According to Ms. Spivey's testimony, the complainant then got back in the car and they drove off. Ms. Spivey said that she did not witness any altercation, and did not see Petitioner get out of the car.

According to Ms. Spivey's testimony, after they arrived at her mother's house, she got out of Christina's car, went into the house for a few minutes, and then walked to the corner store by herself, meeting her friend, Kimberly Francis, on the way. She said that the complainant went into her mother's house. Ms. Spivey testified that, on returning, with Ms. Francis, she saw a little burgundy two-door car drive up with one guy, the Petitioner, in the car. She did not witness any other people in the car. According to her testimony, Petitioner allegedly asked her to give the complainant a message for him, which she refused to do. However, once inside the house, Ms. Spivey told the complainant "Greg out there say can I give you a message." (Trial Tr. Vol. I, p 105.) She testified that the complainant then went outside.

According to Ms. Spivey's testimony, she then heard eight or nine gunshots. She said that the complainant came back into the house and collapsed. Ms. Spivey said that she described the man to the police as being about 5'8'' to 5'10'' tall, weighing about two hundred pounds, with a light complexion. Upon further examination, Ms. Spivey admitted that Petitioner was not a light-complected man.

Kimberly Francis testified that she heard Ms. Spivey tell the complainant that Petitioner was outside waiting for her. Ms. Francis said that she was outside when the complainant came out. It was Ms. Francis' testimony that she heard the complainant and the person in the car exchange harsh words, and then, she heard gunshots. She ran into the house along with the complainant, who she saw was bleeding.

Christina Williams testified that she drove the complainant and Ms. Spivey to Tamikia Spivey's house on the day in question. She said that Tamikia was seated in a car with an individual that she could not name. Ms. Williams corroborated the complainant's testimony in

that she acknowledged that the complainant got out of the car to go talk to Tamikia, and then came back to her car. She heard an exchange of words between the complainant and the individual that was in the car with Tamikia. When the complainant got back into her car, she told Ms. Williams and Ms. Spivey that "Greg" was in the car with Tamikia. (Trial Tr. Vol. I, p. 134.) When they got back to Ms. Spivey's mother's house, Christina went upstairs. She testified that she was on the phone with Tamikia when the incident occurred. Ms. Williams said that she heard the gunshots.

Dr. Michael Taylor, the physician who treated the complainant in the emergency room, testified that the complainant suffered two gunshot wounds to her right buttocks. There was injury to her uterus, and as a result, she lost her fetus. Dr. Taylor said that the bullets remained in the complainant, as there were no exit wounds.

Cleodise Spivey, the complainant's uncle, testified that he was at his mother's home, visiting, when Ms. Williams, and the others, returned to the house after the wake. Ms. Williams came into the house and told him to go outside and see what's going on with "Greg." (Trial Tr. Vol. I, p. 147.) As he proceeded to the front door, he heard shots, and dived to the floor. He saw a car spinning off from the house, but could not say if the individual in the car was male or female. When he came back into the house, he saw the complainant lying on the floor, bleeding.

Officer Mark Greer, and his partner, Officer Shontee White, were the first police officers at the scene. When they arrived, there were people yelling and screaming that "so and so has been shot." (Trial Tr. Vol. I, p. 151.) When they went inside, they saw the complainant lying on the floor. Officer Greer testified that he spoke to Ms. Spivey and Ms. Francis, who said that "Greg shot her, Greg did this." (Trial Tr. Vol. I, p. 152.) The officers found several casings on

the street in front of the house, but Officer Greer could not, on the basis of the casings found, identify the type of weapon used in the shooting. According to Officer Greer's testimony, both Ms. Spivey and Ms. Francis described the perpetrator as a "black male." (Trial Tr. Vol. I, p. 154.)

Officer Herman Williams, the officer in charge of the investigation, testified that he interviewed the complainant and from that interview learned the name of her alleged perpetrator–the Petitioner in this case. He also explained to the Judge why it took approximately seven months to make an arrest in the case; he said that he did not have the information needed, like where the alleged perpetrator, "Greg," lived or his date of birth. (Trial Tr. Vol. I, pp. 170-171.)

After the prosecution rested, the defense presented several alibi witnesses. Tamikia Spivey testified that, on December 2, 1997, the complainant came over to her cousin Yolanda Burnett's house, where she (Tamikia) was temporarily staying. When the complainant came over, Tamikia said that she (Tamikia) was in a car with Petitioner, sitting out in front of the house. According to Tamikia's testimony, the complainant came over to the car and was acting crazy and beating on the window; she said that the complainant said to her "yeah, here this bitch go, she's in the car with this whore ass nigger." (Trial Tr. Vol. II, p 21.) It was her testimony that neither she nor Petitioner got out of the car. Tamikia said that Petitioner did not try to hit Christina's car; she said that Petitioner did not drive away or move the car at all while they were there, and, in fact, she said that the car was not even running.

Shortly after the complainant left with the others, Tamikia testified that she got out of the car and went into the house, while Petitioner stayed outside in the car. According to her testimony, she called Ms. Spivey's house and spoke to Christina about why the complainant was acting so funny. While they were talking, Christina told Tamikia that "bitch, your baby's daddy outside," meaning Petitioner was there. (Trial Tr. Vol. II, p. 12.) Tamikia then said that she dropped the phone and ran outside to see if Petitioner was still there, only to see what she believed to be him turning the corner in a black car.

Chanita Hill, Petitioner's friend, testified that Petitioner borrowed her car on the day in question. She said that, around 10:30 a.m., he came to her work to get the car, and that later that evening, he was over at her house, when someone paged him.

Yolanda Burnett testified that, after the complainant and the others left her house, Petitioner came in and visited with his daughter, who is also Tamikia's daughter. She said that Petitioner appeared to be angry. According to her testimony, Petitioner stayed for about thirty minutes and then left. After he left, she said that Tamikia walked across the street to make a phone call, because there was no phone in her home.

Defense counsel's final witness was Sylvia Alexander. Ms. Alexander and the complainant had worked together as dancers. She testified that she had spoken to the complainant about the shooting, and that the complainant told her that she did not see who shot her but believed it was the Petitioner because she heard his voice. It was her testimony that, after the complainant had told her that, she traveled from Chicago to Detroit to accompany the complainant to the police station, the prosecutor's office, and the district court. She denied ever being paid by the complainant as a bodyguard.

### III.  Procedural History

On September 28, 1999, Petitioner was convicted, following a bench trial, of assault with intent to commit great bodily harm, M.C.L. 750.84, and felony firearm, M.C.L. 750.227b, in the Wayne County, Michigan, Circuit Court.  Sentencing in this case was originally scheduled for November 17, 1999, but Petitioner was absent and a *capias* warrant was issued.  Finally, on September 26, 2002, Petitioner returned to court after being arrested on the warrant, and the trial court sentenced him to four to ten years imprisonment for the assault conviction and two years imprisonment for the felony firearm conviction, the two sentences to run consecutively.

Petitioner, through counsel, then filed an appeal with the Michigan Court of Appeals, raising the following issues:

    I.       The prosecutor improperly questioned the victim about her miscarriage.

    II.      The verdict was against the great weight of the evidence.

    III.     The prosecutor improperly impeached defense witness Sylvia Alexander.

    IV.     Defendant's sentence was disproportionate.

Petitioner then filed an amended brief, through substituted counsel, raising the following claims:

    I.       The Judge's findings of fact in the bench trial do not support the verdict issued.

    II.      The prosecutor denied [Petitioner] due process and the right of confrontation by providing his personal recollection of facts instead of calling a witness.

    III.     [Petitioner] was prejudiced by hearsay testimony that he committed another serious crime, given by someone without personal knowledge.

    IV.     The prosecutor denied [Petitioner] a fair trial by introducing sympathy testimony by questioning the complainant about her allegedly suffering a miscarriage.

V.      [Petitioner] is entitled to a new trial because the verdict was against the great
        weight of the evidence, and based on clearly erroneous findings of fact in a bench
        trial.

VI.     [Petitioner] was denied a fair trial by the prosecutor who impeached a witness
        over objection with questions about not coming forward to police.

The Michigan Court of Appeals affirmed Petitioner's convictions.  *People v. Anderson*,

No. 246187, 2004 WL 1108688 (Mich. App. May 18, 2004) (unpublished *per curiam*).

Subsequently, Petitioner filed an application for leave to appeal with the Michigan Supreme

Court, raising the same issues, and adding a claim of ineffective assistance of counsel.  The

Michigan Supreme Court denied leave on December 29, 2004.  *People v. Anderson*, 471 Mich.

948, 690 N.W.2d 104 (2004).

Petitioner, through counsel, filed the pending petition for a writ of habeas corpus on

December 5, 2005, asserting the following:

I.      Petitioner was denied due process where the judge acted unreasonably and made
        findings of fact in the bench trial that do not support the verdict issued.


II.     Petitioner was denied due process and the right of confrontation where the
        prosecutor provided his personal recollection of facts instead of calling a witness.

III.    Petitioner was denied a fair trial where he was prejudiced by hearsay testimony
        that he committed another serious crime, given by someone without personal
        knowledge.

IV.     The prosecutor denied Petitioner a fair trial by introducing sympathy testimony
        by questioning the complainant about her allegedly suffering a miscarriage.

Respondent filed its answer on March 17, 2006, stating that the Michigan Court of

Appeals' decision, the last court to issue a reasoned decision in this case, was not an

unreasonable application of, or contrary to, federal law.

## IV. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

Petitioner must therefore demonstrate that the Michigan Court of Appeals' decision was contrary to or involved an unreasonable application of existing federal law.

## V. Analysis

### A. Denial of Due Process Claim–The Trial Judge's Findings of Fact

In his first habeas claim, Petitioner alleges that he was denied due process where the trial judge made fact findings that did not support the verdict issued. Petitioner claims that the trial judge's finding of "no specific intent" constituted an acquittal of any charge that required specific intent, including the charge in question–assault with intent to do great bodily harm less than murder. Petitioner challenges the trial court judge's following statement: "I agree that there is no specific intent in this record. And so, I'm going to find the Defendant guilty of the felony[-]firearm and assault with intent to do great bodily harm less than murder." (Trial Tr. Vol. III, pp. 73-74.)

A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir. 2000) (citing to *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state court's application of the *Jackson* standard was reasonable. *Johnson v. Hofbauer,* 159 F.Supp.2d 582, 596 (E.D.Mich. 2001). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Adams v. Smith,* 280 F.Supp.2d 704, 714 (E.D.Mich. 2003) ( *quoting Jackson,* 443 U.S. at 324, n. 16).

Petitioner claims that the facts as found by the trial judge do not support the verdict issued. Therefore, the verdict of guilty of assault with intent to do great bodily harm was unconstitutionally entered.

Under Michigan law, the elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder. *Lovely v. Jackson,* 337 F.Supp.2d 969, 977 (E.D.Mich.2004) (citing *People v. Mitchell,* 149 Mich.App. 36, 38, 385 N.W.2d 717 (1986)). The term "intent to do great bodily harm less than murder" has been defined as an intent to do serious injury of an aggravated nature. *Mitchell,* 149 Mich.App. at 39, 385 N.W.2d 717.

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

> Defendant contends that the trial court's findings do not support the element of specific intent, and also maintains that the trial court acknowledged this deficiency in a statement made while issuing the verdict. This Court reviews the trial court's factual findings for clear error. MCR 2.613(C); *People v Crear*, 242 Mich App 158, 167; 618 NW2d 91 (2000). "Factual findings are sufficient as long as it appears that the trial court was aware of the issues in the case and correctly applied the law." *People v. Legg*, 197 Mich App 131, 132; 494 NW2d 797 (1992) (citing *People v Armstrong*, 175 Mich App 181, 185; 437 NW2d 343 (1989)).

> Defendant's argument on this issue depends entirely on his interpretation of one statement made by the trial court in its findings of fact and conclusions of law. After reviewing the evidence that had been presented and declaring its findings of fact, the trial court stated: "I agree that there is no specific intent in this record. And so, I'm going to find the Defendant guilty of the felony[-]firearm and assault with intent to do great bodily harm less than murder." Defendant interprets this statement as a declaration that the trial court found no specific intent whatsoever,

12

and specific intent is a necessary element of assault with intent to do great bodily harm less than murder. *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). We reject this interpretation, and find that, viewed in its proper context, the trial court's statement meant that the trial court did not find specific intent *to murder*, a required element of the charge of assault with intent to murder, but did find specific intent to commit great bodily harm. "The sufficiency of factual findings cannot be judged on their face alone; the findings must be reviewed in the context of the specific legal and factual issues raised by the parties and the evidence." *People v Rushlow*, 179 Mich App 172, 177; 445 NW2d 222 (1989), aff'd 437 Mich 149; 468 NW2d 487 (1991).

Prior to making the challenged statement, the trial court said that it believed the victim's testimony, as well as the testimony of other witnesses that put defendant at the scene of the shooting. Because the trial court believed this testimony, it properly found that defendant used a gun to inflict serious injuries on the victim, and this clearly is evidence sufficient to support a finding of intent to do great bodily harm. Furthermore the trial court's findings of fact supported its verdict. We need not remand in cases where, as here, it is "manifest that [the trial court] was aware of the factual issue, that it resolved it and it would not facilitate appellate review to require further explication of the path [the court] followed in reaching the result." *People v Jackson*, 390 Mich 621, 627 n 3; 212 NW2d 918 (1973). Accordingly, we hold that the trial court's findings of fact were sufficient to support its verdict.

*Anderson*, No. 246187, slip op. at 1-2.

Prior to making the challenged statement, the trial court judge said that she believed the victim's testimony, as well as the testimony from other witnesses that put Petitioner at the scene of the shooting. The trial court judge stated:

> **But, really what it boiled down to was the question that I asked the prosecution, I think, at the beginning of his argument, or in the middle of his argument, was, would the complainant in this case, and I'm going to say that my impression on this record is, without a question that the complainant has clear hostility for the Defendant.**

13

It was demonstrated, the evidence shows it was demonstrated before this incident, it was demonstrated after the incident, and it was demonstrated in the courtroom in her demeanor in her testimony, so, there's no question about that.

But, my question is, would the complainant hold such hostility for the Defendant as to come into the court and commit a fraud upon this court? And I look at the spontaneous evidence that's in the case. And I look at the complainant in that hospital, at what she said in the hospital, and I just come up with the answer that she wouldn't do it. She wouldn't commit that kind of a fraud. I just don't think so.

The key witness, two key witnesses in this case is (sic) at the time that the perpetrator drove up and asked for the [Complainant], Clara Spivey had a conversation with the Defendant, with the complainant, with the perpetrator.

Kim Frances overheard that conversation. And Kim Frances heard the name Greg. And Kim Frances really is, I think, an independent witness in this case. I didn't get the impression that she was trying to support the complainant or support the Defendant. She was just merely reporting what she saw, what she heard. And she said that she heard the name Greg.

The other thing in this case is that there was actually a conversation between the complainant and the perpetrator. Conversation between the complainant and the perpetrator, conversation between Clara Spivey and the perpetrator and Kim Frances overhearing the name Greg.

And Clara Spivey and the complainant identifying, or saying that it was the Defendant. Plus, the complainant making the statement at the hospital that it was the Defendant.

It just convinces me beyond a reasonable doubt that it was the Defendant.

(Trial Tr. Vol. III, pp. 73-74.) (Emphasis added.) Subsequently, the trial court judge then made

the challenged statement.

Against that backdrop, a rational trier of fact could have concluded, from the evidence presented at trial, that Petitioner intended to do great bodily harm, in light of the injuries that were inflicted upon the complainant in this case. Here, the trial court judge knew that the primary issue was identity and that the secondary issue was level of intent.

This Court therefore finds that, looking at the trial court judge's findings in context, the statement was not a declaration that the trial court judge found no specific intent whatsoever, as the Petitioner contends. Rather, the Court finds that the Michigan Court of Appeals correctly determined that, viewed in its proper context, the trial court judge's statement meant that she did not find specific intent to murder, a required element of the charge assault with intent to murder, but did find specific intent to commit great bodily harm. This Court finds that the Michigan Court of Appeals' conclusion that the evidence was sufficient to support the conviction was thus objectively reasonable, and not an unreasonable application of, or contrary to, clearly established Supreme Court precedent. Petitioner is not entitled to habeas relief regarding this issue.

### B. Procedural Default as to Claim II–Prosecutorial Misconduct Claim, Claim III–Hearsay Claim (Criminal Propensity Claim), and Claim IV–Sympathy Testimony Claim.

Respondent contends that Petitioner's habeas claims II, III, and IV, prosecutorial misconduct claim, hearsay claim (criminal propensity claim), and sympathy testimony claim, respectively, are barred by procedural default.

Procedural default is not a jurisdictional bar to a review of the merits of a habeas petition. *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). Consequently, a federal court is not required to address a procedural default issue

15

before ruling against a habeas petitioner on the merits of his claims. When a procedural default issue presents a more complicated question and is unnecessary to the disposition of the case, a court may proceed directly to the merits of the petitioner's claims in the interest of judicial economy. *See Lambrix v. Singleterry*, 520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1089 (E.D. Mich. 2004); *see also Strickler v. Green*, 527 U.S. 263, 282 (1999) (considering merits of habeas claims where such inquiry mirrored procedural default cause and prejudice inquiry); *see also Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004) (same).

In the present case, resolving the procedural default issue will be more complex than deciding the substantive claims on habeas review and will require some consideration of the merits of those claims. Accordingly, in the interests of judicial economy, the Court will address the merits of Petitioner's habeas claims without ruling on the procedural default issue.

### 1. Prosecutorial Misconduct Claim

Petitioner contends that he was denied due process and the right of confrontation when the prosecutor provided his personal recollection of facts instead of calling a witness. Specifically, Petitioner argues about two portions of the prosecutor's cross-examination of Tamikia Spivey. Petitioner raised this claim in his direct appeal but the Michigan Court of Appeals rejected the claim.

The United States Supreme Court has stated that prosecutors must refrain from improper methods calculated to produce a wrongful conviction. *Berger v. United States,* 295 U.S. 78, 88 (1935). To prevail on a prosecutorial misconduct claim, a habeas petitioner must demonstrate that the prosecutor's remarks so infected the trial with unfairness as to make the resulting

conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974).

Factors to be considered in weighing the extent of a prosecutor's misconduct are: (1) the degree

to which the remarks complained of have a tendency to mislead the jury and to prejudice the

accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or

accidentally placed before the jury, and (4) the strength of the competent proof to establish the

guilt of the accused. *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.1997) (quoting *Serra v.*

*Michigan Dept. of Corrections,* 4 F.3d 1348, 1355-56 (6th Cir.1993)). "[T]o constitute the denial

of a fair trial, prosecutorial misconduct must be so pronounced and persistent that it permeates

the entire atmosphere of the trial, or so gross as probably to prejudice the defendant." *Id.*

(citations omitted).

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case,

stated in pertinent part:

> Also, defendant says that the prosecutor improperly
> provided his personal recollection of facts during his cross-
> examination of a witness. Defendant contends that because he
> could not cross-examine the prosecutor, he was denied his right of
> confrontation. Defendant did not preserve this issue by making a
> timely, contemporaneous objection and request a curative
> instruction. *People v Callon*, 256 Mich App 312, 329; 622 NW2d
> 501 (2003). Therefore, we review for a plain error that affected
> defendant's substantial rights.
>
> Defendant's allegations of misconduct center on two
> exchanges between the prosecutor and a defense witness while the
> latter testified at trial. In both, the prosecutor asked the witness if
> she had previously made a statement to him. In the first exchange,
> the prosecutor asked the witness if she had ever told defendant that
> victim had been "talking bad" about him. The second exchange
> occurred later in the same witness' testimony. The prosecutor had
> asked her if another witness had tried to calm defendant down after
> an argument with victim prior to the shooting. After the witness
> seemed to deny that the other witness had even spoken to

defendant, the prosecutor asked her whether she had previously
told him that the other witness had, in fact, tried to calm defendant.
The witness replied that the other witness had told defendant not to
"mind" the victim, but then stated that this was not an attempt to
calm the victim.

* * *

The prosecutor's statement in the first exchange was not improper
testimony on his part, but was part of the foundational information
required to introduce the statement. *Rodriguez*, *supra* at 34-35.
Because the prosecutor may impeach a witness with a witness'
prior inconsistent statements, we hold that it was not plain error for
the prosecution to do so here.

In the second exchange, the witness does not clearly deny
making the prior statement to the prosecutor. In fact, her final
statements can reasonably be interpreted as an admission that she
made the prior statement but disagreed with the prosecution's
interpretation of what the other witness was trying to do in
speaking to defendant. Where a witness does "not deny [making]
the statements in question, the prosecutor's questioning function[s]
more like 'refreshment' than 'impeachment,' and . . . [u]nder
th[o]se circumstances, we find no error requiring reversal."
*Rodriguez*, *supra* at 35. because the prosecutor here was merely
refreshing the witness' recollection, and he was not testifying, his
questions in the second exchange were not plain error.

*Anderson*, No. 246187, slip op. at 2-3 (fn. omitted).

This Court agrees with the Michigan Court of Appeals' decision. The prosecutor's

questions to Tamikia were not improper. The prosecutor did not act as a witness against

Petitioner or Tamikia–he merely asked Tamikia several questions in an attempt to impeach her

or refresh her recollection.

Further, Petitioner has not established that a fundamental miscarriage of justice has

occurred. The miscarriage of justice exception requires a showing that a constitutional violation

probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S.

18

298, 326 (1995). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 624 (1998). To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. *Schlup,* 513 U.S. at 324. Petitioner has made no such showing. This prosecutorial misconduct claim lacks merit, and therefore, Petitioner is not entitled to habeas relief on this claim.

## 2. Claim III–Hearsay Claim Regarding Criminal Propensity

Petitioner next claims that his trial was rendered unfair by allowing the complainant to testify that Petitioner had raped her friend–hearsay evidence and/or prior bad acts evidence (Claim III). The Michigan Court of Appeals rejected Petitioner's claims without unreasonably applying clearly established Supreme Court law.

An issue regarding the admissibility of evidence or error in state procedure does not rise to a level of constitutional magnitude unless it can be viewed as so egregious that the petitioner was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 125 S.Ct. 126 (2004). To determine whether the admission or inadmissibility of evidence has denied a defendant's fundamental due process rights, the court should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001).

The rulings by a state's highest court with respect to state law are binding on the federal courts. *Wainwright*, *supra* at 84. Furthermore, the Supreme Court has "reemphasize[d] that it is

not the province of a federal habeas court to reexamine state-court determinations on state-law

questions." *Estelle, supra* at 68. The federal courts are bound by decisions of an intermediate

state appellate court unless convinced that the highest state court would decide the issue

differently. *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988).

Here, the Michigan Court of Appeals, the last court to issue a reasoned decision in this

case, stated in pertinent part:

> Defendant further maintains that the trial court committed error requiring reversal when it allowed the victim to testify that defendant had raped her friend. Defendant asserts two claims of error with regard to this testimony: first, that it is hearsay, and second, that it is inadmissible evidence of criminal propensity. * * * However, defendant's argument that the testimony is inadmissible propensity evidence, here raised for the first time, is not preserved, *People v. Avant,* 235 Mich.App 499, 512; 597 NW2d 864 (1999), and consequently, this Court's review is for a plain error that affected defendant's substantial rights.

> The victim testified that some time prior to the shooting, she said, within defendant's hearing, that defendant had raped her friend. Victim made this statement as she was getting back into a car after a verbal confrontation with defendant. Later, at another location, defendant shot the victim. After the victim verified that she had indeed said this, defense counsel merely said: "Excuse me. Excuse me." The trial court then stated: "Sustained. The Court will disregard it." At a later point in victim's testimony, the prosecutor again brought up victim's statement about the rape, and asked her again what she had said, whereupon defense counsel objected on the grounds of hearsay; the trial court overruled defendant's objection.

> * * *

> The prosecutor argued at trial that the statement was not hearsay because it was not offered for the truth of the matter asserted. The prosecutor's theory of the case was that defendant, angered by things the victim had said about him, "lashed out" at her. Under this theory, it would be important to show that defendant was aware that the victim had made statements that would have

angered defendant. The prosecution presented evidence that the victim had said uncomplimentary things to another witness about defendant, but that witness denied relaying this information to defendant. It was therefore important to adduce any evidence available that victim had made statements in defendant's presence that would have given him a motive to assault her. Moreover, the defense presented evidence that defendant was not upset after the argument with victim. It was therefore important to present rebuttal evidence that victim had said things to him inflammatory enough to upset a normal person.

Given the evidence presented, it would not be unreasonable to believe that defendant heard the victim's statement about the rape; his violent reaction immediately after she made it is further evidence that he heard and was angered by it. Accordingly, we find that the trial court's decision to admit the statement is not "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but the defiance of it," *Hine, supra* at 250, and hold that the trial court's decision to admit the evidence was not an abuse of discretion.

Defendant also argues that the statement regarding the rape was "improper evidence of 'criminal propensity.'"

* * *

The victim's testimony that she had said, within defendant's hearing, that he raped one of her friends, is relevant. Defendant's subsequent attempt to strike victim immediately after she made the statement tends to show that he was angered by it, and makes it more likely that defendant had a motive for his subsequent attack on her. The trial court stated that motive was of consequence here. We agree with the trial court, and consequently hold that the admission of this evidence was not a plain error affecting defendant's substantial rights.

*Anderson*, No. 246187, slip op. at 3-4 (fn. omitted).

In regard to Claim III, Petitioner alleges that the testimony was inadmissible evidence of

criminal propensity. However, at trial, defense counsel objected to the statement on the basis

that the testimony was hearsay, and not that it constituted prior bad acts testimony. Though the

claim was procedurally defaulted, the Michigan Court of Appeals nevertheless reviewed the issue for plain error, and found no error. To the extent that Petitioner alleges that the evidence was admitted in violation of federal law, there is no clearly established Supreme Court precedent that holds that a state violates due process by permitting propensity evidence in the form of other bad acts. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Furthermore, regarding Rule 404(b) evidence, the Sixth Circuit has specifically upheld state convictions against similar habeas challenges on the ground that the use of such evidence in those cases was not fundamentally unfair. *See Burton v. Renico*, 391 F.3d 764, 773-775 (6th Cir. 2004); *Coleman*, 244 F.3d 542-543. The same conclusion is warranted in this instance.

Petitioner's claim that the complainant's testimony constituted improper hearsay is a claim that is also based on state law. The Michigan Court of Appeals' finding, under Michigan law, was not an abuse of discretion of the trial court to overrule defense counsel's objection to the statement. The trial court judge stated that "there is permissible hearsay and impermissible hearsay. And, this is a non-jury trial, so I think this Court is able to keep the two separate." (Trial Tr. Vol. III, p. 21.) There is no evidence in the record that the trial court judge impermissibly relied on the complainant's statement in finding Petitioner guilty of the lesser charge. Petitioner has failed to demonstrate an affirmative showing of prejudice.

This Court finds that the Michigan Court of Appeals correctly concluded that the admission of the evidence was not error under the Michigan Rules of Evidence. Its decision is not an unreasonable application of, or contrary to, clearly established Supreme Court precedent. Petitioner is not entitled to habeas relief on this claim.

### 3. Claim IV–Sympathy Claim

In his fourth habeas claim, Petitioner alleges that he was denied a fair trial by the prosecution's introduction of sympathy evidence; that the complainant suffered a miscarriage. The Michigan Court of Appeals rejected that claim. Because Petitioner did not properly preserve this issue, the state appellate court reviewed for plain error and found that Petitioner's substantial rights were not affected. It held: "we hold that evidence of the full extent of the victim's injuries was properly admitted as material to proving defendant's intent to murder, the offense with which the prosecution charged defendant." *Anderson*, No. 246187, slip op. at 5.

As noted by the Michigan Court of Appeals, the testimony was not improper. This Court also finds, as did the Michigan Court of Appeals, even if the testimony were improper, any error was harmless. Petitioner has failed to demonstrate that he was prejudiced from the testimony. The record reveals that the trial judge did not base her decision on sympathy in this case. The trial judge clearly stated that she's "not going to use sympathy to decide this case." or "any other prejudice." (Trial Tr. Vol. III, p. 71.)

This Court therefore finds that the state appellate adjudication of Petitioner's Claim IV was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Petitioner is therefore not entitled to habeas relief on this claim.

## VI.  Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal

habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH**

**PREJUDICE**.


S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  August 2, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 2, 2007, by
electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary